All right, our next case this afternoon is First Bankers Trust Company versus Memorial Medical Center. That's case number 4150603 for the appellant, Edward Kionka. Pronounce that close. Okay. And for the appellant, Michelle Ongjasho. Che. Che. Well, I tried. Please proceed. Thank you, Your Honor. Good afternoon. May it please the Court, I am Edward Kionka, and I represent the plaintiffs, the estate of Dramara Civils, Jr., and his parents as his representatives. We will refer to the baby as DJ and his father as Dramara. This is a medical negligence case for catastrophic injuries suffered by DJ shortly after birth as a result of Group B strep infection, which was not diagnosed in time. At trial, the only remaining defendant was Memorial Medical Center. This appeal is from the judgment in favor of the hospital and from the denial of the plaintiff's post-trial motion. The issues on appeal are, first, did the trial court err in denying plaintiff's motions for judgment, NLV, or in the alternative for a new trial? Second, was Nurse Estreich improperly allowed to testify as to the hospital's supposed policy or procedure for routing parent phone calls to maternity nurses and to testify hypothetically to what she would have said if she hypothetically had been the nurse who answered the telephone call? I'd like to first discuss the testimonial errors. The Sibyls were discharged from the hospital at 12.40 p.m. on April 7, 2007, only 35 hours after DJ's birth. At 5.13 p.m. that same day, Dramara called MMC and spoke to someone, apparently a nurse, in the maternity section. The call lasted eight to nine minutes. The fact of the call is undisputed. He did not get the name of the nurse, and he did not recognize her voice. If it had been one of the nurses who had attended the Sibyls, he would have recognized the voice because he knew those nurses on a first-name basis, including Nurse Estreich. Neither Nurse Estreich or any of the other nurses who might have been on duty at that time remembered the call. The hospital did not document the call. The hospital did not record the call. The evidence, direct and circumstantial, is overwhelming that during the call, Dramara told the nurse that DJ was not eating. His feeding problems had continued. He was throwing up whatever he took, and that he had certain other symptoms such as a fever and jaundice. The call, Your Honors, could not have been for any other purpose. The only direct evidence as to what the nurse said was Dramara's clear, coherent, unimpeached, uncontradicted testimony. In response to his concerns about DJ's failure to eat, the nurse told him, keep trying. Don't give up. As to the fever, she said, loosen his blankets. As to the jaundice, she said, that's not uncommon in newborns. When it's light, just put him in the window where he can get some sunlight. The nurse did not tell him to call DJ's doctor. She did not tell him to come to the emergency room, instructions which they would immediately have followed. She told him, if things don't get better or if they get worse, give us a call back. To counter this testimony over objection, the defendant presented the testimony of Nurse Jean Esterak as to what the hospital's and her procedure was for the routing of parent calls and what she would have said hypothetically if she had received the call. The purpose, of course, of that testimony was to show that even though she didn't remember it, the call, in fact, had been routed to her, and that was the defendant's whole theory of this case. It was a statement that was made in opening statement. It was a statement that was made in closing argument, despite the fact that there was no evidence of that, that she had received the call, except for the fact that she testified to a procedure for routing parent calls. Well... Wasn't there affirmative testimony that the other nurses who were on duty did not receive the call? No one remembered it. No, there was no affirmative testimony one way or the other. Nobody remembered it. Nobody remembered the call coming in. One way or the other. One way or the other. Okay. First of all... Didn't your client call nurses who clearly were not even present at the hospital at the time the call was made? The... Jamara followed the instructions that were given upon discharge, which was to call this nurse hotline. And so that was the number that was called. There were actually two calls. One... I meant call as witnesses. Oh, as witnesses. Certain nurses testified. Certain nurses did testify. Well, not directly. The only nurse who testified was Nurse Oesterreich, that is, other than experts. There was admissions read from depositions of three other nurses, but that was for... But none of those three were even present... That's correct. ...at the time the call came in. That's correct. Well, so what was the purpose of that? That's correct. The purpose of that was to show that, in fact, the procedure, if there was a procedure, was not followed, because they testified that calls were routed to whoever happened to be available. That was the sole purpose of their testimony. Didn't Nurse Oesterreich testify that when she was on duty she got these calls? She testified that there was a procedure to route the call under certain circumstances to the discharged nurse, and she was the discharged nurse. But she had no memory of having received that call, and she was barred by the court, specifically from testifying, correctly barred, from testifying that she was probably or likely or might have been the person who received the call. So her testimony, the only way to link the call to her, was this hypothetical procedure that she said... Sometimes she described it as her personal procedure, because she was barred from... She was not an expert witness. She was not identified or called as an expert witness. And so sometimes she described it as her procedure, but it would have had to have been the hospital procedure. But there was no foundation laid for that procedure. She simply said, this is the procedure. There was no basis for showing where the procedure came from, how they were trained, whether it was followed. Well, what if the evidence should have been permitted to begin with? They're the police, so they benefited by the verdict. They can't appeal the ruling, but was this the correct ruling with regard to business practice? If it was the business practice of the hospital, that the discharge nurse would have taken the call, why would Nurse Esterich not be properly permitted to say, I was the discharging nurse? So even though I don't remember it, the practice is the call would have come to me. Why shouldn't that have been invisible? Because the procedure itself, Your Honor, is not a proper procedure. You can't testify, a witness cannot testify to guess, speculation, or conjecture to what might have happened on particular occasions. Like saying, well, I don't remember this accident, but here's what I would have done if I did remember it. Well, it's more than that. It's the question of to whom would a call be referred or who would be the person. There's no question the call was made. Yes. The call was made and responded to by some nurse. Yes. So the question is, what's the business practice of MMC with regard to calls coming in under these circumstances? Why would you not be able to testify as to the practice? It goes to the discharge nurse, and that was me. Because for a business practice, it would have to qualify under Rule 406. There's no rule of evidence that would permit you to testify to a standard procedure or policy to prove the conduct of an employee on a particular occasion. That's improper testimony. But under the Illinois rule, what is the policy of the hospital, the practice that preexisted? Well, the discharge nurse gets the calls, if available, from the parents who are calling about the child who was just discharged a short time ago. I don't understand why that wouldn't be permissible under either Illinois rule or the common law. Well, it would have to qualify under the Illinois rule, because otherwise you're offering what people have done in the past for purposes of proving that's what they did on this occasion. That's improper under the rules of evidence. You can't simply testify. Isn't that the whole purpose of the business practice exception? Yes, that is. But to qualify, and we've cited a lot of cases. We cite Graham in this, Graham's evidence. In order to qualify under that, it has to be habitual, semi-automatic, extremely or invariably regular. It has to be automated. It has to be the kind of thing that can be automated. Ministerial acts, the Connect case says, mailing, filing, sending notice, and the like. In this case, Oesterreich's own testimony proves that her procedure does not qualify under that rule. The routing, the person who receives the call, and by the way, we don't know if that person even knew the procedure. We don't know because it's Easter weekend, it's Saturday afternoon, it's a late afternoon on Easter weekend. Who answers the phone? We have no idea. We don't know if that person was in the chain of that procedure to begin with. But apart from that, it has to be an automated or kind of ministerial thing in order to qualify under 406. There's a lot of cases on that which we have cited. Well, here, the decision as to how to route the call, it's more complicated. And we've cited, we've included a discussion of that, of what she testified on pages 44 and 45 in our brief. We've referenced the appendix in which her actual testimony, you can read her actual testimony. It would require professional decisions based on the information. You have to ask the parent questions, and then the person receiving the call has to decide, is this an emergent situation? Is this a feeding situation? Is this something else that can be handled by any nurse? So depending on what they learn from the parent, which requires some professional judgment, right? Is it an emergent situation? Then they decide whether that call goes to nurse X or nurse Y or so on. That is a complex decision tree, and that is requiring many discretionary decisions. And that's as far removed as you can get from a habitual semi-automatic procedure. And that's what's required under Rule 406. And Rule 406 simply codifies preexisting Illinois law in that respect. As I said, you also have to show that the procedure was triggered. Here we don't know who answered the phone, whether the person who answered the phone even knew the alleged procedure. Now, their purpose, of course, and defense purpose in offering this, was to call into question Dramar's testimony as to the content of the telephone call. Because if it was routed to nurse Mr. Reich, which is pure speculation to begin with, if it was routed to her, then she was permitted to testify what she would have said in that call. That is absolutely improper. You can't testify to what you would have said in a hypothetical call. That's an opinion. She was called as a non-opinion lay witness. It doesn't qualify for any exception. What was the explanation by the court for letting in this testimony? The court, in our brief, we've included all the colloquy with the court on that. The court simply said, I'm going to let her testify to the procedure, but I'm not going to let her testify that she was the person who received the call. Which, of course, is a little bit inconsistent, I think. But, nevertheless, the court didn't really give any background or basis in law for that decision. We had filed a motion in limine to bar her testimony. That was the initial basis for that. It came up a couple of times during the trial. We've documented all of that in our brief. And then, finally, the judge ruled again over her objection, that she could testify to the procedure. She can say, this is the procedure that was followed. But there was no real explanation as to why the judge made that decision. To what extent was Dr. Sroka's testimony premised upon anything that Nurse Esterich testified to? I'm sorry, Your Honor? To what extent was Dr. Sroka's testimony, the defense expert, premised upon anything that Nurse Esterich testified to? I don't believe that his testimony was related to that at all. He testified to nothing inconsistent with plaintiff's medical evidence. He testified to what he learned from reading the medical records up to the point of discharge. And he said, basically, his testimony was that nothing, I don't see anything in the records, showing that a sepsis workup should have been done prior to discharge. But the claim of improper discharge is no longer in the case. So I don't think his testimony really relates to Nurse Esterich. So the claim that malpractice occurred was with regard to the failure of the nurses to respond appropriately, whichever nurse received this call? To the call, exactly, exactly. Did the defense offer any testimony that, excepting, what do you call him, Dharma? Dramara? Yes, I believe that. Excepting Dramara's testimony that, nonetheless, the hospital was not negligent? That would not be possible, Your Honor. That wasn't my question. My question was, did the hospital offer any such testimony? No, they didn't. In fact, the standard of care, which was testified by our expert, Camille DeCostanza, was the nurse standard of care expert. At trial, the hospital declined to call someone who they had designated as an expert, because they said her standard of care is correct so we don't have to call her. They, in effect, conceded that DeCostanza's standard of care that she testified to was correct. And she testified that, given the history and given to the symptoms that were described in that telephone call, it was a violation of professional standards to not tell the parents to call the pediatrician or bring the child to the emergency room. There was no dispute about that standard of care. And, in effect, they conceded it. In fact, Your Honors, in the closing argument, defense counsel said, in effect, all the elements of the case were either proved beyond dispute or conceded. Duty, there was no question about duty. Standard of care, the nurse standard of care was conceded by the testimony of Camille DeCostanza. Our other expert on pediatric standard of care said that, given these symptoms, the child should have been given antibiotics immediately, regardless of what any tests showed. The defense evidence was concentrated in the idea that we don't think that up until Sunday, the next day, there was evidence of sepsis that tests would have shown. But that's irrelevant. That's irrelevant because our expert testimony said, and it was not disputed, said that even without the septic workup, the first thing you do is you administer these antibiotics, and then you figure it out later because there's no downside. The basis of the case, then, is essentially the failure of the nurses to respond appropriately to what Dramara said. To what extent were there inconsistencies in his testimony as to what he said, specifically the deposition that he was cross-examined about where he testified somewhat differently in any way, and how should we view all that? That was not a sufficient impeachment. There was no impeachment of Dramara. We've cited law that a witness is not discredited by a slight variance between his testimony and prior statements. There has to be a material inconsistency. Well, that's a question for the jury to decide. I mean, at jury trial, the jury could decide what they believe was said in that phone call. Was it the deposition or was it the testimony he gave at trial? Wasn't that for them? But they were consistent. They were consistent in the important respects. They couldn't find that to be impeaching because you can't impeach on a collateral matter. As to the main issues, you know, whether there was a feeding problem, and, of course, that was well documented in the hospital records, he had had feeding problems from the time he was born. All the evidence was that there should have been, he should have been feeding every two to three hours during the whole time they were in the hospital. My specific question was about any inconsistencies between his testimony and his deposition concerning what he said. Right. So he's testifying that the feeding problems had continued. He wouldn't take. We tried a bottle. He wouldn't take it. He threw up. That's what he testified at trial. He also had symptoms of jaundice. In his deposition, he said, we told them he was jaundiced. We were concerned about him not eating. We noticed periodic grunting and breathing. And then he ends his testimony about when they were questioning about that, he said, what else? Which suggests that there may have been other things that he would have talked about if they had followed up and asked about it. But apart from that, the key testimony was that there was jaundice. It's consistent between the trial and the deposition, jaundice, and the continuing eating, feeding problems, which under the conceded standard of care should have required him to be brought back to the hospital. Thank you.  Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. Plaintiff's briefs, taken as a whole, basically say that they should have won. They're asking this Court to overturn a reasonable jury's verdict for the defendant. Now, there's no argument here that the jury was improperly instructed. And this trial came down to a question of fact. What transpired on that fateful April 7th phone call between the parents and the nurses? The jury heard evidence for almost two weeks. Some evidence at trial favored the plaintiff, some favored the defendant. And then the jury issued a unanimous verdict for the defense. Even if the jury concluded that it did not know what happened on that phone call, because the father was not credible or because the evidence was conflicted, the plaintiffs failed to meet their burden of the verdict. Did you argue the credibility of the father in the phone call? Absolutely, we argued that at trial. What was your theory? What's the defense theory as to what the father said in the phone call? And more specifically, I'm curious as to whether or not there was any expert testimony saying something to the effect like this. The plaintiff claims he said X to Amara in this phone call. And based upon that, then there was malpractice by the hospital nurses for not giving certain instructions. However, if instead of saying X, Amara had said Y, then there would be no malpractice by the nurses. Was there any such distinction drawn? Was there any such evidence presented by the defense? Close. Who was it who testified to it and what did he say? The plaintiff's nursing expert, Camille DeCostanza, did testify at trial that under the series of facts that Jamara testified to at trial, there was a breach of the standard of care. There were a litany of things that he said were said to him on the phone, or that he reported, rather, on the phone. And then she said, it's true, that even if the only thing said on the call was, quote, my baby is not eating, the standard of care should have been to refer the parents to the ED or the pediatrician. To the what? ER? The emergency room or the emergency department or the pediatrician. Okay. But here, the jury could have easily concluded that the child was eating on April 7th and that there was not a major feeding issue at the time of the call. The feeding issues were a major focus of the cross-examination of the father. And it was inconsistent. Okay. So then this goes back to the deposition, doesn't it? It does, Your Honor. Okay. He testified that he mentioned in the call that the child wasn't eating and was vomiting, I think. That was his testimony. So then he was confronted with his deposition. What did he say then? On cross-examination, he testified that he reported vomiting on the phone call, not just a concern about some difficulties with breastfeeding. That contradicted his deposition testimony where he never reported vomiting during the call. At deposition, the father testified there was no bottle feeding whatsoever prior to the April 7th call. At trial, he gave contradictory testimony, admitting that there was some successful bottle feeding before the April 7th call. That's in the Record on Appeal, Volume 15, page 180. Similarly, on direct exam, he testified that once DJ had an emesis at the hospital that morning of April 7th before discharge, he never ate again prior to discharge. But on cross-examination, when he was confronted with medical records, he conceded that, that's right, I forgot, there were no difficulties prior to discharge with breastfeeding. Now, in a case relating to feeding, vomiting, jaundice, and other complaints that are purportedly undeniable signs of a serious infection, these are not minor contradictions. And it was reasonable for the jury to infer on the basis of those contradictions that he didn't have a good memory, or they didn't know what happened on the call, or that he just was wrong. So what was the theory you argued to the jury as to the call he made and what he said in it? We argued in closing that the jury believed their version of the events, sure. We, quote, screwed up. But what we said actually happened on the call was run-of-the-mill lactation advice. It was undisputed that the parents called the lactation line first before they called any other. And the scenario we argued in closing was this. Mom's home, it's her first baby, she's a first-time parent, she's just been discharged today, she's nervous, we're alone, our parents aren't here, he was just circumcised earlier today, I'm having a little bit of trouble getting him to feed, what should I do? And as Gene Estreich testified, those kind of conversations on the lactation line happen all the time. In fact, there's such a demand for that kind of non-medical, practical advice on lactation that hospitals offer lactation lines to the public. And that was our argument in closing, that there wasn't a serious feeding issue going on here, that they needed some help, new parents, how do I use a nipple shield, how do I position him properly, we need some reassurance and guidance. There were additional contradictions in the father's testimony. He testified at deposition that he had reported periodic grunting and actually thought there was a problem with DJ's breathing. Say that again, he reported what? Periodic grunting. Okay. And actually believed there was a problem with DJ's breathing. But he omitted this from his trial testimony, and that was brought out on cross too. It doesn't matter why his testimony changed, but it changed, and the jury noticed. Now, as you heard Mr. Kiyanka argue, these were not significant changes, or were they, did they have medical significance? Your Honor, I, with all due respect, I disagree with Mr. Kiyanka in a case alleging that these kinds of feeding problems were undeniably serious warning signs of a lethal infection. Those kinds of contradictions matter. It's more an omission than a contradiction. For instance, what's the significance medically that anyone testified about the grunting that was testified to, but not part of the deposition? I don't believe there was medical, I don't believe there was expert testing on what would be the significance of the grunting, because at the end of the day, he didn't offer it affirmatively at trial. It was brought out on cross. But there was a clear contradiction on issues such as, was this child successfully bottle feeding before the April 7th call, or wasn't he? Was he vomiting up feeds, or wasn't he? Those are very clear contradictions, I would respectfully suggest, Your Honor. What about this as a thought? Was there any expert witness who testified that had Damara called and not mentioned the things you just spoke of, then there was no violation of the standard of care by the hospital if the nurses just said what Damara said they said. In other words, I'm looking to see to what extent was this significant. Now, there's an inference that could be drawn if the plaintiff's medical expert says, if what Damara said to the hospital was true, then there's a violation of the standard of care. So your argument is, it's not true, and the inference then is, therefore, the violation of standard of care didn't occur. Correct. I'd be a lot happier with this result if there had been some defendants experts who said, by the way, you know that those inconsistencies, had that been what he said, then there would have been no violation of the standard of care, as opposed to leaving it to the jury to have to infer. I don't know if I'm being clear. You understand what I'm saying here? Let me give it a try. I think I do. There certainly was testimony by Dr. Sroka, the board-certified pediatrician, that at least up until the time of discharge, this baby was doing great, and that his feeding pattern was normal. And that was four short hours before the fall. The focus, everyone seems to agree, is on the phone call and what was said there and what that meant. But we did, of course, have testimony at trial from our world-renowned pediatric infectious disease expert, Dr. Prober, from the University of Stanford, who opined that these symptoms were not at all related to the infection, and, in fact, they could not possibly have been. His testimony was that an early-onset GBS strep infection of the sort that this young child had is not the type of infection that meanders over the course of 24 or 48 hours. Rather, it's an extremely aggressive infection that can cause an infant to crash in less than 6.5 hours, sometimes even two hours. So he said, if the complaints that were articulated on April 6th or 7th were being driven by an active infection, that child would have fallen apart, crashed in short order, and he would have died. This type of strain doesn't take 24 hours or 48 hours to crash a newborn baby. It takes 6 hours, 5 hours, 4 hours. But that testimony does not speak directly to the issue in this case, which is the phone call. It's circumstantial evidence that indicts... Speaking about circumstantial evidence, the deposition that was taken at the bar was taken sometime well before trial, wasn't it? That's true, Your Honor. And your deposition, your theory is based on the deposition that this is what he really said, as opposed to what he claimed during his testimony at trial. So none of this could have been a surprise. I don't know that we would take the position that one was what he really said or the other was what he really said. The point that we tried to bring out on cross at trial, Your Honor, was the story is changing. The story is inconsistent. Well, let's assume... How about this as a thought? Had he testified at trial to the same thing he testified in his deposition, would he have, in your judgment, established that the hospital had violated the standard of care? It's almost impossible to answer that question, Your Honor. Why? Because there are so many variables that change. Did he get bottle fed? Did he not get bottle fed? No, no, no. Was he bottle fed? Was he not bottle fed? There are no variables that are changing. Sure. Let me give you my premise again. You have his deposition. I do. Let's assume he testifies totally consistently with it. Would that have been enough to establish by the plaintiff that the hospital violated the standard of care? I don't think it would have, Your Honor. I think you're right. At least that's your theory. So here's my next question. Where's your expert who would have so said? That is, you should expect Damara to testify at trial as he did in his deposition. And if your theory is when he testifies the same thing, that's not enough. And here's Dr. Smedley who's going to say that. Or someone who's going to provide that, by the way, you know, this is not a violation of the standard of care. And where is that person? And, Justice Stegman, we had an expert who was going to come to trial and testify. However, once we heard his testimony on direct examination, and we knew it contradicted his deposition testimony, we knew this was going to come down to a question of fact. That's why we didn't have to call a standard of care expert. Well, it's a troubling explanation because, at best, the test, as you conceded, and rightly so, if the jury believed his testimony at trial, then the hospital screwed up. Then the hospital should be liable, then the standard of care has been violated, right? So the question is, I suspect, not shocked, but probably surprised, hey, the testimony at trial, that's not what he said in his deposition. That's right. And that's what the jury had to base their decision on. But why wouldn't you, when you confront him with his earlier statements, which are admissible substantively he's the party, then you could turn around and say, call your expert who said, by the way, you know, that's what you should believe was his statement, and here's Dr. Smedley to say, this did not violate the standard of care, as opposed to leaving it to be inferred by the jury. Your Honor, we didn't see a reason to put another expert on the stand when we had before us a very clear fact dispute. What transpired on that call? He couldn't give a consistent story. The mother testified. She couldn't give a consistent story about whether his eyes were yellow or not. But she didn't make the call, so it's just the mother. True, but she was testifying about symptoms that she saw at the time of the call, and she wasn't consistent either. In addition, Dramara's testimony was further made uncertain because of the emergency department records from April 8th from Memorial Medical Center. On cross-examination, it was established that Dramara and the mother were the only two individuals who accompanied DJ to the emergency department on April 8th. He agreed on cross-examination that only the two of them could have provided any history to the doctors and the nurses in the emergency department. And what do the historical notes on that emergency department record say? They say DJ had never vomited since being discharged. They say he had no fever. And they say that he had experienced a mere decrease in oral feeding as opposed to refusing all oral intake. Well, that would support an inference that what Dramara said in his deposition would be the more accurate. That also contradicts his deposition testimony, Your Honor. Those three points also contradict his deposition testimony. Are those statements that are attributed to him or to the mother? They are statements that are attributed to a medical record where he agreed on cross-examination only he or the mother could have provided the history. And that is volume 15, page 180 to 181 of the record on appeal. I have to concede, counsel, I'm still troubled by the idea that you have a witness ready to testify if Dramara had stuck to his deposition testimony that this is not a violation of the standard of care and didn't call this witness when he changed. So you just are arguing inconsistencies and inference as opposed to direct testimony. An inference that because of this changed testimony, there's no longer a violation of the standard of care when you could have had someone testify directly to it. Well, no expert witness could resolve a factual dispute. No, no, there's no factual dispute to be resolved here. Again, my premise is, assuming he had testified as he did in his deposition, did you have an expert witness ready to say, that testimony did not violate the standard of care? Say that to me one more time, Your Honor. Assuming Dramara testified entirely consistently with his deposition, did you have a witness ready to testify that based upon Dramara's testimony, the hospital did not violate the standard of care? No, but we still do. I thought you said yes a moment ago. So we had a standard of care witness who would testify that if the litany of events that were taken together under all the circumstances were as he testified, then we screwed up. And that's the same position we offered in closing. That part is clear. I want to be clear. Then maybe I wasn't clear earlier because my question was, if he testified consistently with his deposition, I thought you said you had an expert witness ready to say, then the hospital did not violate the standard of care. Respectfully, Your Honor, that issue wasn't presented to the jury because he did not testify consistently with his deposition. I know, but I am asking you, did you have someone? Because I'm nosy. I don't know if that's the legal standard. Our nursing expert would have testified, just like Mr. Farchione said in closing, that if it were true that the litany of things that were complained about were in fact true on the phone, that yes, the parents should have been referred to the emergency department or the pediatrician. What litany of things? The litany of things from the deposition or from the trial testimony? Certainly the trial testimony at that point. That's what we argued in closing. And that's the only evidence the jury had available to it. So while I appreciate the court's point, it's academic with regard to a jury decision. It is absolutely within the province of the court to evaluate conflicting versions of testimony and to issue a verdict as a result. Did the plaintiff's expert witness, was he confronted with that same question? In other words, the plaintiff's expert witness testified, if I understand correctly, that what Damara said in his testimony, that establishes a violation of the standard of care, if Damara was accurate. Did you ever ask the plaintiff's expert witness, well, assume the following doctor expert witness, that Damara had said X, Y, and Z based upon his deposition testimony. What would be your opinion then? Close. Nurse D. Costanza conceded on the stand that whether the standard of care was violated or not really depended on what transpired during that phone call. Absolutely conceded that. But you argued to the jury that, hey, don't believe his testimony at trial. We didn't argue believe the deposition. We said it's inconsistent. Okay, fair enough. But it would have been a lot easier, I think, if I had been on the jury, had you asked the plaintiff's expert witness, assume that what he had said in that phone call, according to his deposition, was what happened. What would your opinion then be? Would it still be that the hospital violated the standard of care? We know that she testified that even if he said only, my baby's not eating, my baby stopped eating, that would be a violation of the standard of care. We know she said that. But the plaintiff's evidence didn't even get that far. And remember, we didn't argue. I take it this is a no, you didn't ask that. You didn't ask the plaintiff's expert witness the question had, if his deposition was correct, as far as what he said, would your opinion be the same, that he still violated the standard of care? That particular question wasn't asked, but a very similar, a very close one was. And her response was, even if he only said, my baby stopped eating, then refer to the emergency department or a pediatrician. But the fact remains that where there's a substantial factual dispute, disclosed by the evidence at trial, and there is an assessment to be made of the credibility of the witness, that the constitutional right of the parties to a jury determination must be carefully preserved under Illinois law. Thank you, counsel, you're out of time. Thank you. Any rebuttals? Yes, thank you, your honor. This issue about the inconsistency between the trial testimony and the deposition shows that the defendant is grasping at straws here. That is clearly a red herring. There is no fundamental inconsistency. You have to show a contradiction of some kind or a material omission in order for there to be an inconsistency. And we have documented carefully in our brief the deposition testimony and the trial testimony. In the deposition, he said, we told them he was jaundiced. We were concerned about him not eating, and also mentioned the grunting. And he also testified at trial to jaundice and continuing eating problems. There's no inconsistency there. So there was nothing for them to build on in making an argument about trying to show that his trial testimony should be disbelieved because it's inconsistent. Now, they did try to bring up another inconsistency where there was a – after they brought him on Sunday, they called the St. Louis tele-nurse, and she said, you get him to the hospital right away. They took him to Memorial. They looked at him briefly there. They said, you better go to St. John's because we have better facilities there to treat this. They went to St. John's. During all of that time, there were multiple – the parents or drivers or whoever it was, statements were multiply recorded. And all of those were consistent with his trial testimony as to what he said in the phone call. He repeated those same things. Now, there was one which was a little different, but we don't know anything about how that was recorded. Whereas in these others, which we've documented in our brief, we have shown that doctors recorded those particular communications in which he stated the same symptoms that he had stated – that he testified that he stated in the phone call. Now, we know that under the rules of law that if you make a statement for purposes of medical diagnosis and treatment, that's given weight. There's a hearsay exception for statements for purposes of medical diagnosis and treatment because they're presumed to be reliable. In this case, we have multiple corroboration of his trial testimony. So we have that, and we have no material inconsistency with his deposition. Therefore, under the case law, Your Honor, the jury simply could not have disregarded that. But they did. They did. How'd that happen? They did. Your Honor, there's no way of knowing that. The jury simply got it wrong. This is a sympathetic case, a very tough case. Justice Sterner asked exactly the question I was wondering about. What's your speculation? What happened here? Your Honor, as I'm sure the Court knows, lawyers who try these types of cases know that juries are reluctant to return a verdict against medical professionals and against hospitals, even when liability is clear. They're simply reluctant to do that. And they will try and find some reason not to return a verdict. We don't know what it was. We have no way of knowing. But my former partner knew this, and when he was arguing a medical negligence case to a jury, he would say, Ladies and gentlemen, if Dr. So-and-so was driving his car down the street and ran into my client and injured him, I know you wouldn't hesitate to return a verdict against him. They ran a stop sign, blew a stop sign around him. Well, that's exactly what happened in this case. They blew a medical stop sign. That's what happened in this case. The evidence is overwhelming that in that telephone call, the nurse simply ran a medical stop sign. She didn't give the right advice. She didn't do what the standard of care required. So this is one of those rare cases. Or the information she was given wasn't consistent with what Premier's testimony was. Well, Your Honor, I don't see how we can disbelieve his testimony because it's entirely consistent, it's uncontradicted, it's unimpeached. Well, how can you contradict it when you don't know to whom he was speaking? Well, he testified. He can testify. You know, sometimes you say, well, there's no evidence. Sometimes the client will say, well, I don't have any evidence of this. Yes, you have evidence. You have your testimony. That's the evidence in this case. It's his testimony. But the testimony the defendant wanted to put on, you didn't want them to even be able to put on. The nurse simply said, here's what would have happened had I taken the call. You're suggesting that they should have been allowed not to refute in any manner whatsoever what he said in that telephone call as far as accuracy. Is that correct? Your Honor, they were perfectly free to do that if they could. But that's the nature of trial evidence. I mean, either you have evidence or you don't. He has direct, uncontradicted evidence as to what he said, and it's corroborated. And if they can't rebut it, then that's simply the way the facts are. Okay. You're out of time. Thanks to both of you. The case is submitted. The court stands in recess.